### BUCKNER v. CARTER et al.

(Court of Civil Appeals of Texas. Dallas. May 6, 1911.)

1. TRUSTS (§§ 17, 18*)—PAROL TRUSTS—ENFORCEMENT.

A parol contract between parties, in pursuance of which one party purchased real estate for the joint benefit of all the parties, is not within the statute of frauds, and is enforceable.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 21, 22; Dec. Dig. §§ 17, 18.*]

2. TRUSTS (§ 366*)—ENFORCEMENT—PARTIES.

In a suit to adjudge that a purchaser at an execution sale of the franchises of a street railway company is a trustee for plaintiffs under an agreement to purchase for their benefit, the company, not a party to the agreement, is not a necessary party.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 574; Dec. Dig. § 366.*]

3. TRUSTS (§ 41*)—PAROL TRUSTS—BURDEN OF PROOF.

One asserting that a purchaser at an execution sale is a trustee, under a parol agreement to purchase for his benefit, has the burden of showing by a preponderance of the evidence that the purchaser obtaining a deed in the usual form holds the property in trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 60; Dec. Dig. § 41.*]

4. APPEAL AND ERROR (§ 1001*)—VERDICT—CONCLUSIVENESS.

An appellate court will set aside a verdict not supported by evidence of a substantial character.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3934; Dec. Dig. § 1001.*]

5. TRUSTS (§ 44*)—PAROL TRUSTS—EVIDENCE—SUFFICIENCY.

Evidence held not to show that a purchaser at an execution sale purchased under an agreement to hold the property in trust.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 44.*]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Consolidated actions by R. C. Buckner against J. Mercer Carter and others, and by the latter against the former. From a judgment for Carter, Buckner appeals. Reversed and remanded.

W. H. Clark and W. C. Kimbrough, for appellant. D. W. Bowser, for appellee.

TALBOT, J. The appellant, R. C. Buckner, the plaintiff below, instituted this suit on April 2, 1910, in the Fourteenth district court of Dallas county, Tex., against the appellee, J. Mercer Carter, to enjoin him from damaging and destroying three certain railway franchises alleged to be owned by appellant, under and by virtue of three certain ordinances, duly enacted by the city of Dallas, granting a right of way, or easement, over and along certain streets of the city of Dallas, for the building and operating of an in-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

terurban and street railway, which suit, on May 13, 1910, upon motion of the appellant, was, under its own name and style, consolidated with cause No. 6,900, of J. Mercer Carter et al. v. R. C. Buckner, pending in the same court, and also involving the ownership of said franchises, between the same parties.

Plaintiff's verified petition in said consolidated suit alleged, among other things, that on the 29th day of August, 1908, the defendant, J. Mercer Carter, instituted suit in the Sixty-Eighth district court of Dallas county, Tex., against the Dallas Interurban Electric Railway Company, a corporation organized under the laws of Texas, and others, wherein said Carter made parties plaintiff or defendant all of the officers, directors, and stockholders of said company. That thereafter, on the 30th day of July, 1909, said suit came on to be heard, and final judgment by agreement was rendered, wherein it was adjudged and decreed that Otto H. Lang, one of the parties to said suit, have and recover of and from said Dallas Interurban Electric Railway Company the sum of $4,500, with interest thereon from July 30, 1909, at the rate of 8 per cent. per annum, together with a foreclosure of the vendor's lien, existing to secure the payment of said $4,500, against all parties to said suit, upon said railway franchises and other properties which were described in said judgment; that, there being default in the payment of said judgment of the $4,500 and interest, the said Lang had issued thereon an order of sale, commanding the sheriff of Dallas county to sell the said three franchises and rights of way, and all the property upon which said vendor's lien was foreclosed in said judgment, in satisfaction thereof, which sale was duly made on the first Tuesday in February, the same being the 1st day of February, 1910; that the plaintiff, R. C. Buckner, was the best and highest bidder at said sale for the sum of $4,700, which said sum the plaintiff, R. C. Buckner, paid to the said sheriff, and thereupon received the deed of the said sheriff, duly executed, which was duly recorded on the 2d day of February, 1910, and the plaintiff, R. C. Buckner, then and there became the sole owner and holder in fee simple of said franchises and rights of way, and has so remained up to the present time; that the plaintiff, R. C. Buckner, wishing to prevent said franchises from being forfeited by the city of Dallas, because of the failure and default of J. Mercer Carter to pay the annual franchise tax of $1,500, did, on March 24, 1910, pay said tax of $1,500, and received from the city of Dallas the tax receipt therefor. That thereafter, on March 30, 1910, the plaintiff, under and by virtue of said franchises and permit of the city of Dallas, began the construction of said interurban railway, and is now engaged in the construction thereof; that plaintiff has organized and perfected arrangements under and by virtue of which he verily believes he will be enabled to construct and build said interurban railway in accordance with the terms and provisions of said franchises granted therefor, unless prevented by the wrongful and illegal conduct of the defendant, J. Mercer Carter; that the defendant, J. Mercer Carter, was wrongfully asserting that he and the other defendants, prior to the date of the sale of said franchises by the sheriff to the plaintiff, procured the loan of sufficient money from C. C. Slaughter and B. S. Wathen to purchase the said franchises, rights of way, etc., and that it was understood and agreed that the plaintiff would buy in said franchises and other property in his name, for the benefit of himself and the said J. Mercer Carter and the other defendants; that in pursuance of said understanding plaintiff did buy in said franchises at said sheriff's sale, and that, with the exception of $500 furnished by plaintiff, the $4,700 paid for said franchises by plaintiff was procured and furnished by defendants.

Plaintiff alleges that neither the said Carter nor any of his associates furnished to him, or caused to be furnished to him, any part of the money used in the purchase of said franchises; that the defendant, J. Mercer Carter, wrongfully filed with the mayor and commissioners of the city of Dallas a petition, asserting that he represented the owners of said franchises, rights of way, etc., and asked for permission to commence work under said franchises; that said petition was filed in order to interfere with and injure and prevent, if possible, plaintiff from exercising the rights and privileges he is entitled to under said franchises, and in order to wrongfully convert said franchises to his own use and benefit, and to cloud plaintiff's title thereto, and to prevent him from completing his financial arrangements to build said interurban railway from the city of Dallas, via Buckner's Orphans' Home, to the city of Terrell, Tex.; that, having so asserted his right, title, and claim to said franchises, the said defendant, J. Mercer Carter, was engaged in plowing up the streets embraced in said franchises, pretendedly as owner of said franchises, in violation of plaintiff's rights as the absolute owner of the same, and if not restrained will inflict irreparable injury upon plaintiff. Plaintiff further alleges that defendant Carter is notoriously insolvent, cannot be made to respond to plaintiff for the damages he will inflict upon him if not restrained, and prays for a writ of injunction enjoining the defendants, and especially the said J. Mercer Carter, from in any wise undertaking to perform, exercise, or convert any of the rights, privileges, or powers in said three franchises, and especially from taking possession of or going upon any of the streets or any part of the streets, embraced in said franchises for any purpose pertaining to the grading or construction of said interurban railway.

A temporary injunction, as prayed for, was granted, and all the defendants answered by general and special demurrers and a general denial, and by way of cross-action alleged: That on or about the 1st day of January, 1910, the Dallas Interurban Electric Railway Company, a corporation organized and existing under the laws of Texas, was the owner of all the franchises, rights of way, and easements described in plaintiff's petition; that Otto H. Lang recovered the judgment as alleged by plaintiff, Buckner; that the sheriff of Dallas county, by virtue of an order of sale issued on said judgment, levied on the franchises, rights of way, and easements granted to said company, and advertised the same to be sold on February 1, 1910; that on January 27, 1910, the defendant, J. Mercer Carter, proposed to B. S. Wathen, of Dallas, Tex., that if he would be one of a number of persons to contribute the money to pay said Otto H. Lang judgment, or buy the property in at the sale, for the purpose of preserving the franchises in their then condition of ownership, and a further sum to pay the franchise tax and claims due the city of Dallas and the state of Texas, that the said J. Mercer Carter and the other defendants herein would transfer to the said B. S. Wathen, or other parties contributing money for such purposes, capital stock in said Dallas Interurban Electric Railway Company, of the par value of $100 per share, for $12.50 per share for such sums so contributed. That in response to said proposition the said B. S. Wathen accepted the same in the form of a written proposal, of which the following is a substantial copy:

"Dallas, Texas, 1-27.

"J. Mercer Carter: Dear sir: I will make one of eight or ten persons to pay off the Otto Lang claim against the so-called J. Mercer Carter franchise under the terms you suggest, and will also make subscriptions to take up the city franchise and state claims on said basis. Yours truly, B. S. Wathen.

Otto H. Lang......................  $4,800 00
State ............................   1,500 00
City .............................   1,500 00
                                    ─────────
                                    $7,800 00

—the approximate amount due."

That thereafter, on January 28, 1910, the defendant, J. Mercer Carter, met the plaintiff, R. C. Buckner, made the same proposition to him that he had made to Major B. S. Wathen, and showed him the letter of acceptance of said Wathen above set forth, and proposed that if he would furnish, or procure to be furnished, funds to assist in preserving the franchises, that the defendants would transfer, or cause to be transferred, to plaintiff, or other persons who might so contribute funds, stock at $12.50 per share for each share of the par value of $100 out of the paid-up stock owned by defendants, as aforesaid, and that the said R. C. Buck-

ner, plaintiff herein, stated that he would procure two or more shares upon that basis, and agreed to aid and assist defendants in assembling the funds necessary for the protection of said franchises; that plaintiff, R. C. Buckner, had for several weeks prior to that time been working with defendant, J. Mercer Carter, and co-operating with him in an effort to reorganize the Dallas Interurban Electric Railway Company, and to procure the contribution of funds to pay the Lang judgment and other claims against said company, with a view of financing and building interurban and local lines of railway as authorized by the charter of said company; that the said R. C. Buckner well knew the value of said franchises, and the value of defendants' stock, and knew that the defendants, through J. Mercer Carter, were using every effort to preserve the franchises in the ownership of the Dallas Interurban Electric Railway Company, to so save the value of their stock therein, as well as the stock of other stockholders in said corporation; that the said R. C. Buckner, on and after January 28, 1910, continued to work and co-operate with defendant, J. Mercer Carter, in his efforts to raise the funds necessary to protect said franchises at the sheriff's sale on February 1, 1910, and that the only understanding or agreement under which they worked together was the one hereinbefore outlined involving the B. S. Wathen letter, and the oral proposition upon which the same was based; that through the efforts of the defendant, J. Mercer Carter, and his daughter, Cecil Ross Carter, the sum of $4,850 was raised on February 1, 1910, for the purpose of protecting said franchises at said sheriff's sale; that $3,500 of said money was furnished through the plaintiff as a result of the efforts and request of the defendants, J. Mercer Carter and Cecil Ross Carter; that $850 was furnished to the plaintiff by B. S. Wathen at the request of J. Mercer Carter, and that $500 was furnished to K. R. Craig by C. C. Slaughter, for the purpose of protecting an interest in said stock claimed by the said Craig; that the said K. R. Craig afterwards declined to contribute his $500, and that plaintiff, R. C. Buckner, voluntarily told defendant, J. Mercer Carter, that he would make up the deficiency out of his own personal funds; that at the sale, and in pursuance of the arrangement above outlined, the plaintiff, R. C. Buckner, bid on the property and bought in the same for $4,700, and the same was conveyed to him by a sheriff's deed on February 2, 1910; that at said sale the plaintiff, R. C. Buckner, declined to accept the deed to himself as trustee, but took the deed to himself individually, and has failed and refused to recognize the interest of the defendants, or the Dallas Interurban Electric Railway Company, in said property, and refuses to accept the stock as agreed, claiming that he owns said property individually;

that the property bought by the plaintiff under said sheriff's sale is of great value, to wit, $75,000 or more, and that it is inequitable and unjust for the plaintiff to acquire so valuable a property for the pitiful sum of $4,700, and deprive defendants and the Dallas Interurban Electric Railway Company and its other stockholders of the benefit of the agreement entered into between Major B. S. Wathen, R. C. Buckner, the plaintiff, and the defendants herein; that to the best of their knowledge and belief the plaintiff has no property subject to execution, and that they will be irreparably injured, unless the alleged agreement between defendants and plaintiff and Wathen is specifically enforced; that they have always been ready and willing to deliver to the plaintiff, and all parties who might be entitled thereto, stock in said Dallas Interurban Electric Railway Company, as proposed, at $12.50 per share, and that they here and now tender into court, for the benefit of said R. C. Buckner, or other parties whom the said Buckner may designate as being entitled thereto, the sum of $37,600 of the paid-up stock of said corporation to cover the sum of $4,700 paid at said sale, and a further sum of $12,000 in stock to cover a payment of $1,500 made by plaintiff, R. C. Buckner, under said agreement to discharge the franchise tax due the city of Dallas for the year 1909.

The defendants prayed that "on a hearing hereof the plaintiff, R. C. Buckner, be declared to be the holder of the legal title to said franchises, rights of way, and easements of the said Dallas Interurban Electric Railway Company, as trustee for the benefit of the Dallas Interurban Electric Railway Company and its stockholders, and that said sheriff's deed of February 2, 1910, be construed as a trust, and that the title to said property be re-established in the Dallas Interurban Electric Railway Company, and that the stock hereby tendered into court be adjudged the property of the plaintiff, R. C. Buckner, or of any other persons whom he may designate as being entitled to the same, and for such other relief, both general and special, as the defendants may be entitled to under the premises."

The plaintiff, R. C. Buckner, filed his first supplemental petition, duly verified, in which he pleaded a general demurrer to the defendants' cross-bill, a general denial, and for special answer to said cross-bill expressly denied that he purchased said franchises and rights of way in trust for said railway company, or the defendants, or any of them, or said corporation's stockholders, and averred that J. Mercer Carter, nor the Dallas Interurban Electric Railway Company, nor any of the defendants, nor any of said stockholders, furnished the plaintiff said $4,700, or any part thereof, with which to purchase said franchises, rights of way, etc., but that all of said $4,700 was paid by plaintiff, R. C. Buck-

ner, for and in consideration of the deed from said sheriff to him, conveying to him the absolute title in said franchises and rights of way.

The plaintiff's demurrers to the defendants' cross-bill were overruled, the case tried before a jury, and resulted in a verdict in favor of the defendants, upon which a judgment was rendered, denying the injunction prayed for by plaintiff, and decreeing that the sheriff's deed executed to plaintiff, Buckner, under his purchase, February 1, 1910, was "a deed in trust for the benefit of the Dallas Interurban Electric Railway Company, and that plaintiff thereby holds the legal title of the franchises, rights of way, etc., conveyed therein as trustee for the use of said railway company and its stockholders." It was further adjudged and decreed that the stock certificates representing capital stock of said railway company to the amount of $49,600, which had been tendered into court by defendants, to be the property of plaintiff, Buckner, and that he pay all costs of the suit. From this judgment, the plaintiff appealed.

The first and second assignments of error assert that the trial court erred in overruling the appellant's general demurrer. The propositions under the first assignment are, in substance, (1) that defendants' cross-bill does not allege that plaintiff ever entered into a contract with defendants, or either of them, obligating himself to buy in the franchises as trustee, or himself pay the purchase money therefor, and then sell the franchises to Carter or the railway company for capital stock of said company at $12.50 per share; (2) that the contract alleged, if any, is within the statute of frauds, and void. The proposition urged under the second assignment is as follows: In all suits against a trustee, where the suit involves a contest as to the trusteeship, and is to establish title, and divest out of him the property, the cestui que trust is a necessary party. The first proposition under the first assignment has not been overruled without some hesitation. We have concluded, however, that the facts alleged, if true, probably entitle appellees to the relief sought. The contract alleged was not obnoxious to the statute of frauds.

[1] We think it is well settled, that a contract between parties, in pursuance of which one purchases real estate for their joint benefit, is not within the statute of frauds, and will be enforced, notwithstanding the agreement is not in writing.

[2] Nor do we think the Dallas Interurban Electric Railway Company was a necessary party to the suit. It does not appear that the said railway company was a party to the agreement claimed and on which the cross-action is based, and defendants do not in said action seek to procure any judgment adverse to the interest of said company. An examination of the authorities cited by ap-

pellant in support of his contention will disclose, we think, that in each case an adverse judgment could have been rendered against the cestui que trust, or that the relief sought would adversely affect his interest.

[3] The principal question for determination is whether or not the evidence introduced is of sufficient probative force to sustain the verdict and judgment rendered in favor of the appellees. We have reached the conclusion it is not. The sheriff's deed, executed and delivered to the appellant, Buckner, is in the usual form of such deeds. It does not describe the grantee therein as a trustee, nor does it contain any language whatever indicating that he bought, or that there was intended to be conveyed to him, less than the absolute title to the property described in said deed. The burden of proof was therefore upon the appellees to show by a preponderance of the evidence that the appellant purchased and held the property described in said deed in trust as alleged by them.

The material testimony introduced and relied upon by appellees to meet this requirement of the law is that of B. S. Wathen, J. Mercer Carter, R. O. Carter, and some parts of the testimony of the appellant himself. B. S. Wathen testified: "I wrote that letter dated January 27th, a few days before the sale of the franchises. Mr. Carter appealed to me to assist in trying to preserve his franchises, and wanted to get me interested with others, and stated that he wanted to offer stock to a sufficient number of people to be gotten together to furnish the necessary funds to take up the debts and buy these franchises in. I remember that Mr. Samuell and Dr. Buckner were among those who came around, and we discussed it on several occasions before this. I wrote that letter, proposing to subscribe to as much as $5,000 of the stock to assemble these funds. I think I was to receive the stock at about the rate of $12.50 per share in this Dallas Interurban Railway Company; I had been told it was validated in a suit which had been pending, and the Attorney General had passed on the question of whether or not it was valid stock. I was to have enough of that stock at $12.50 per share to compensate me for the money that I subscribed. I don't know that Dr. Buckner or Samuell ever made that proposition to me, but I know they knew about the proposition. Carter, Buckner, Samuell, and I had several interviews about the matter; I don't know how many. Up to the time of the sale, Dr. Buckner had never approached me for the purpose of borrowing any sum of money to invest in the franchises. On the day of the sale—February 1st, I believe it was—I wrote a check for $850, payable to the sheriff and personally handed to Mr. J. Mercer Carter; he called at my office to get it. After I had advanced the money, and it had been used in the sheriff's sale under the Lang judgment, I expected to be interest-

ed in the stock of the company, or at least in the franchises, and I thought up to the 22d day of February that I was interested."

J. Mercer Carter testified: "Dr. Buckner met at Craig's office with Colonel Samuell and Slaughter and Scarff and others to attempt to negotiate with myself and my family's interest, amounting to $250,000 odd worth of stock, with a view to raising money to buy my stock, 2,400 shares, at $12.50 per share, amounting to $30,000. Wathen signed for $5,000. Dr. Buckner took his book, and said he could get two or three more to sign it. We couldn't consummate it before the sale. I then went to Wathen, talked the matter over, and told him what he would get. He says, 'I will accept your proposition,' and he took up his pen and wrote this letter of January 27th. Now, the next morning I met Dr. Buckner at Craig's office, and I showed him the letter, and told him what it meant, and he said, 'Well, I might help some; but I have no money of my own, and don't know where I could get any.' On this proposition he said he had no money, and didn't know where to get it, and I showed him where to get it. At Meador & Davis' office, on the day of the sale, Dr. Buckner was sitting on the opposite side of the table from my son, and my son answered the phone, and I passed the phone to Dr. Buckner, and he talked to some one over the telephone—I suppose my daughter. He got up, and said, 'I feel encouraged; I will go to see Colonel Slaughter.' It was nearly 1 o'clock, or a little after, and the phone rang again, and my son got the receiver and laid it down, and said, 'It is from Buckner;' he says, "if you can get the sale put off, I can come to the rescue with $3,500."' I got the sale put off, and returning from the courthouse I met Dr. Buckner, and he says, 'Well, I have got Slaughter's check for $3,500; but it doesn't include Craig's $500.' He knew that I had borrowed $500 from Slaughter to Craig, and had phoned Craig to get it. I sent my son after Craig, and told Dr. Buckner I would go to see Wathen about this check. He said, 'Get all you can.' While they were about ready to read the bill of sale, Craig declined to let his $500 go in, unless I would let the franchises be sold to the highest bidder. I declined to do this. Then Dr. Buckner had never yet intimated to me that he was not going to act on Wathen's proposition. I stated in my petition that I showed Dr. Buckner a letter from Wathen to me about eight or ten months ago, on the basis of $12.50 to make up this $4,700, and I did show him that letter. The pleadings make their own statement about what Buckner agreed to do. Dr. Buckner asked Craig to bid for him, but just before he asked him to bid Craig repeated his proposition that he didn't want to put his $500 in, unless I would agree not to claim any interest in it; but I wouldn't agree to do that. Dr. Buckner said, 'I don't feel like acting as trustee,'

and I said, 'Doctor, it shan't involve you one cent, if you will go on and bid these franchises in, and I will engage not to hold you responsible for one cent.' "

R. O. Carter testified: "I am a son of J. Mercer Carter. I was present in Meador & Davis' office when Dr. Buckner was present. They were taking part in a conversation in regard to preserving these franchises. Dr. Buckner was taking part in the conversation. They were figuring up to see how much it would take to buy it in. * * * We decided that we could probably save the franchises if we had $3,500. I believe I made the remark that I wished I had it so I could bid it in, and I think Dr. Buckner made the remark that we all wished that. The telephone rang while I was there. I answered it, and my sister, Miss Cecil Ross Carter, was on the other end of the line, and she asked if I had raised the money, and I handed the phone to Dr. Buckner. I know that he took a little memorandum book out of his pocket and wrote her name down in the book, and he asked me her name. What I could gather was that my sister had been to the First Baptist Church to see Mr. Slaughter, in an effort to get him to either loan my father the money, or Dr. Buckner the money, to preserve these franchises. After they had talked some time, probably a minute, he hung up the receiver, and said, 'I feel encouraged; I believe I will go and see Slaughter.' I had a telephone message from him while I was in Meador & Davis' office in which he said, 'If you can get the sale put off,' and I said, 'No, Mr. Davis has just phoned that he couldn't get it put off.' Dr. Buckner said, 'I am sorry; I believe that if we could get it put off a few minutes I could come to the rescue; I can get $3,500.' I told my father what he said. He said, 'Tell him to come on; I will get the sale put off,' and I told Dr. Buckner to come on. After the sale I went into the sheriff's office with the rest of them, and was there when the checks were paid over. If I remember correctly, my father had the $850 check when I first saw it, and gave it to Dr. Buckner. I asked my father how the check was made out. He said to the sheriff. I went to Dr. Buckner and asked him to let me see the check, and he handed it to me, and I read it; it was payable to the sheriff, and was to be used in the purchase of the franchises, and was to be paid through John Davis, trustee, but I didn't know under what conditions my father had gotten the check, so I held it in my hand until after the sale, and then followed Dr. Buckner and Mr. Craig and Mr. Henry, I believe, back into the sheriff's office. I sat on a desk with the check in my hand. Dr. Buckner was sitting down at the table with this $3,500 check, and he wrote a check of his own for $500, and I laid the check down and says, 'Doctor, here is the rest of your money.' He had too much money, and the sheriff suggested that he write one for a smaller amount. I went back there to see that Mr. Wathen's check was used for the purpose for which it was drawn."

Appellant, Dr. R. C. Buckner, among other things, testified: "I do remember to have been somewhere with Carter; yes, I remember now that Scarff was in Mr. Craig's office, and on that occasion and in that place, and on many occasions and in many places, I have discussed with persons about means to protect these franchises, but entered into no agreement to do so with any of them, except I may have said something like this: 'Well, if you gentlemen raise money to protect these franchises, I will go in with you and take some stock.' They all dropped out, except me and Wathen and Carter and a few others. I didn't go to him [Wathen] to borrow that money until after the sale. I had his check on the day of the sale. Mr. Carter brought the check to me. I used the money to help buy those franchises. I didn't see Wathen on February 1st. I didn't know that Wathen was going to furnish the money; I supposed he would; he told me he would. I remember the telephone was turned over to me at Meador & Davis' office, and I think I talked to Miss Carter; possibly I said to her that I couldn't get the money from Slaughter, and had no money of my own, and possibly I did not say that to her. I don't remember telephoning Meador & Davis' office, and telling young Carter to postpone the sale, that I was coming to the rescue with $3,500, but the sale was postponed. I might have said that in my ex parte disposition. I don't remember using such words as 'coming to the rescue.' It was to save the charter; I didn't propose to rescue any man, but the charter or franchise was what I meant to rescue. After I arrived at the courthouse, I decided finally to bid on these franchises in the interest of a line to the orphans' home. I intended to pay for it out of the money I had in my own hands. I used the money from Slaughter, $3,500, and the $800 or $850 from Wathen. Mr. Davis had told him [Carter] that the efforts to raise whatever sums was needed was an entire failure, and he could do nothing else, and therefore it was not necessary for me to tell him [Carter] that I was going to buy the property in for myself. Mr. Davis was Mr. Carter's attorney, as I understood it."

On the other hand, the appellant, Dr. Buckner, testified:

"I personally attended the sheriff's sale of these franchises. When they were sold by the sheriff, I was present at the sale, and had Mr. Craig bid the property in for me. I bid through him. It was knocked off to me; the price was $4,700. I paid the money to the sheriff in his office. It was my money. Mr. Carter, nor any of his family, furnished me with any of the money. I announced at the sale that I wouldn't bid on them in any other way, except as the absolute owner of the franchises... I not only did

not buy in as trustee, but I had no such thought. After I found out Carter would have no interest in it, I decided to buy it myself, and there was no trust about it. The sheriff delivered this deed to me, and I had it recorded, and then I went to work to try to start the building of the interurban, so as to protect the franchises. When I started to work, I started to get men with means to go into an organization and build the road. I put men actually to work on the right of way, and had men on the street actually working with teams, when Carter also began operations along the same lines.

"After this sale, Carter and I met two or three times on the sidewalk, and we had some conversations, but the question as to whether or not he had any interest in the franchises wasn't discussed at all. He proposed to sell me the charter of the company, inasmuch as I had the franchises—the charter from the state of Texas. I told him, in substance, that I didn't know whether I wanted his charter or not; but I might consider the proposition. He referred to his financial ruin, and said that there was danger of his home being sold over his family's head, and he asked me, 'Can you, or will you, pay me $1,000 for my charter to-morrow?' I told him to let W. C. Kimbrough examine his charter, and I would let him know. When he told me that he had lost everything, he didn't intimate to me that he had any interest in the franchises that I had bought. He was present at the time the sale was made. He was standing near to me. I said to Mr. Carter, 'I will not buy these franchises, if you are to have any interest whatever in them, because moneyed men will not put their money in where you are concerned'; and I said, 'It is embarrassing to me, as your friend, to say it, but absolutely I will not bid on the franchises if you are to have any interest in them.' Whereupon he [Carter] held up his hand, and took an involuntary oath, before the crowd, that he had no interest whatever in the purchase. I borrowed an even sum of $850 from Major B. S. Wathen. I gave him my receipt for the money. I have paid him back, and have his receipt for my money. I borrowed $3,500 of the money from C. C. Slaughter. I gave him my note, and I owe that money now, and am paying him 8 per cent. interest on it. Mr. Carter went up to Wathen's office and brought back his check for $850. He did that; but I regarded that as my money, and Wathen so regarded it, first requiring my verbal promise to him that I would return it to him on demand. As a matter of fact, that money was loaned to me, and I paid it back. Before the Wathen check was cashed, I went to see him, and all he said was that he wanted my verbal promise that I would return it on demand, and I told him that he had my promise.

"I heard read in the pleadings of Carter a letter from Wathen to him, dated January 27th, which stated that Wathen would join in with eight or ten others and put up the necessary money to buy these franchises at this sale, and take stock at $12.50 per share; that Carter showed me this letter, and asked me to be one of the eight or ten to go in with Wathen to protect the franchises from sale. I have to say that I entered into no such contract. I don't know that I ever heard of or saw that letter until yesterday, but I might have done so; but I know that I entered into no agreement with him to invest money into any such proposition. The reason I bought the franchises was to preserve them and get the road to the orphans' home. As one of the company of men, I talked with Carter and others in regard to the matter; but I didn't enter into any agreement with anybody to go in with them and buy them in. The reason I went to C. C. Slaughter to get the $3,500 is because Slaughter is a personal friend of mine. I didn't intimate to him what I wanted with the money. I hadn't seen Slaughter about borrowing any money up to the morning of the sale; in fact, I had not made up my mind that I wanted to borrow any. I never agreed with six men to pay $5,000 each. I never entered into any agreement with Wathen or anybody else."

Mr. K. R. Craig, a lawyer of the city of Dallas, testified, in substance, that he was present when the sheriff sold the franchises, and bid in the property for Dr. Buckner; that he was Mr. Carter's attorney in a suit brought by him against the Dallas Interurban Electric Railway Company and others, in which certain stock of the company was canceled; that his fee was an interest in stock of the corporation, and that he had been active in trying to realize on his fee in the stock and property of the corporation; that he refused to furnish any money with which to purchase the franchises at the sheriff's sale, if the purchase was made for the benefit of the Carters, as well as himself and Dr. Buckner. He further stated: "Mr. Carter wanted to know of me what sort of title I wanted before I would put in any money, and I told him I would want the sale made so that if I bought it in I could step out in the street afterwards and sell it for $10,000, and have the right to do it, and put that money in my pocket; that was defining the kind of foreclosure and purchase that I would require, before I would put any money in it at all—to close everybody out. Dr. Buckner stated that that was the only kind of purchase he would be willing to go into. Finally he [Carter] came to Dr. Buckner and told him to go ahead and purchase the property; they would have no title or trust or claim of trust against him. Then Dr. Buckner asked me if it would be all right. I told him that was the only safe proposition to go into, and about that time the sheriff began to cry the property, and I told Dr. Buckner to bid, and he asked me to bid for him, and so I bid

against Lang for the property, and it was finally struck off, and when the sheriff looked to me and asked who was the purchaser, I told him that Dr. Buckner was the purchaser. They—Carter and his son—assured Dr. Buckner that there would be no trust, and that neither he nor any of his family would claim any interest in it, and he could buy it clear."

Several other witnesses testified to the effect that appellee, J. Mercer Carter, just immediately before the sale, stated to Dr. Buckner that if he (Buckner) would buy in the property he (Carter) would refrain from having anything to do with the road; that he had no further interest in it. And Will T. Henry testified that when the property was finally offered for sale defendant, J. Mercer Carter, addressed the sheriff and crowd, and stated, in substance, that he was being sold out, and that it was not right. In addition to what has been quoted from the testimony of B. S. Wathen, he said: "I made the loan to Dr. Buckner on February 3, 1910. The check (of $850 given to Carter) had been made payable to the sheriff under certain conditions, and the sheriff couldn't collect it, because the sale was not made in accordance with the terms of the check. The check was payable to the sheriff, if the sale was made to one Mr. Davis as bidder * * * and when the bank found out that the same had not been made under that condition they refused to honor the check, and I validated the check to the bank on February 3d. When Dr. Buckner came to see me, I asked him what his intentions were, and I said, 'Dr. Buckner, I have gone into this thing purely to try and preserve these franchises and get this line built; if that is your intention, I will validate the check,' and he said that was his intention, and I validated the check by a written note to the bank. If he was to accomplish anything, he was to keep the money; and if he shouldn't be able to accomplish anything with the project he was then to return the money. He didn't pay it back, until I told him I didn't think he was going to accomplish anything. He didn't pay it back, until I asked him for it. My proposition to Carter was that I would be one of eight or ten to raise this $7,800 necessary to protect the franchises. He never got the eight or ten men together on that proposition. The proposition didn't go through to its final completion within my knowledge."

On redirect examination J. Mercer Carter testified: "I heard the statement of Lewis that I said that if Buckner bought in these franchises that I, nor any of my family, would have any claims on them. That testimony of Mr. Lewis is not true;" and R. O. Carter, on cross-examination, testified: "It is not true that my father, at that sale, made the statement that his interests were being

sold out; he did make a statement to the effect that his interest would be sold out if the sale went to certain parties, and that they would go ahead and build the road. * * * My father made some language about these fellows selling out his interest, and then I led him away." On redirect examination he said that his father did not make the statement that if Dr. Buckner would buy in the franchises he would release all claims to the road.

It will be observed that whatever contract Wathen and appellees entered into the same was as is expressed in Wathen's letter of date January 27th, and the oral testimony offered by appellees upon that subject, and appellees claim that appellant entered into a similar contract with them. We do not think this claim is supported by the evidence; nor do we think the evidence sufficient to sustain a finding that the property sold at the sheriff's sale of February 1, 1910, was bought by appellant in trust for the Dallas Interurban Electric Railway Company or its stockholders. On the contrary, we believe the overwhelming preponderance of the evidence is to the effect that the appellant bought said property for himself individually; that he did not enter into a contract or agreement with the appellees, or either of them, that he would be one of eight or ten to raise the $7,800 necessary to protect the franchises involved in this litigation, and, in pursuance thereof, bid in said franchises and other property sold under the Lang judgment in trust, or otherwise, for the railway company or its stockholders. So clearly is the great weight of the evidence to this effect that it would be wrong, in our opinion, to permit the verdict of the jury and judgment entered thereon in the lower court to stand.

[4] It is undoubtedly true that the appellate courts of this state have usually treated the verdicts of juries with great deference, and have been slow to set them aside, but, unless the court can say that the verdict is supported by evidence of a substantial character, it should not be allowed to stand. Formerly, in some jurisdictions, any evidence, even a scintilla, was considered sufficient to authorize and sustain a verdict, but it seems to be now settled law that the question for the judge "is, not whether there is literally no evidence, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established."

[5] Upon the evidence disclosed by the record before us, we are unwilling to sanction the verdict of the jury in this case, and the judgment of the court below will therefore be reversed, and the cause remanded.

Reversed and remanded.